The evidence tended to show that on or about 15 April, 1912, plaintiff and one W. M. Paul had acquired and held an option on a valuable lot in the city of Charlotte, known as the mansion house lot, at the stipulated price of $80,000, and as a consideration had deposited their notes for $500 each. That desiring to avail themselves of their option, the holders, with others, chiefly the defendants, (229) proposed to form a corporation and erect a sky-scraper on such lot, to cost not less than $400,000, the undertaking to be entered upon when a bona fide stock subscription of $100,000 should have been obtained. In pursuance of this purpose, plaintiff and his associate, W. M. Paul, and defendants, subscribed to as much as 260 shares of said stock at par value of $100 per share. That much of the stock subscribed for was on condition that the amount considered requisite, to wit, the $100,000, should be first subscribed, and several of them on condition that they should be allowed to pay for their subscription in service of value to the company. That the option being about to expire, the corporation having been first formed, the company took over the option and bought and took a deed for the property, paying therefor $20,000 in cash and securing the remainder of the contract price, $60,000, by notes to the vendee and deed of trust on the property to secure the same; the notes of plaintiff and Paul having been assumed by the company and liquidated in the deal. In making the cash payment of $20,000, the amount of $10,000 was raised on the note of the company, indorsed by plaintiff and defendants, and the second $10,000 was secured by second mortgage on the property. In taking over the option at $5,000, the same was paid for by issuing 33 shares, the shares in controversy, to plaintiff and 17 shares to plaintiff's associate, W. M. Paul, and there was evidence tending to show that in addition to the option the plaintiff and W. M. Paul were to give their services to the company in the effort to obtain the amount of stock subscription considered necessary to render the undertaking a feasible project.
The evidence further tended to show that the parties failed to obtain the amount of subscription desired and deemed requisite for the purpose contemplated, and the subscribers having some concern as to their possible liability to creditors by reason of their subscription, and desiring to settle the amount and question of such liability, assembled in corporate meeting and passed resolutions as follows:
At a called meeting of the stockholders of the Equitable Realty (230) Company, held in the office of Paul Chatham on the 25th day of *Page 188 
November, 1912, the following stockholders being personally present, S. B. Alexander, Jr., E. T. Garsed, Paul Chatham, C. C. Hook, C. A. Meisenheimer, and J. J. Meisenheimer, and the following represented by proxy, W. H. Thompson, the following resolutions were unanimously adopted:
Whereas, at and before the organization of this company the following parties agreed to subscribe for the stock therein in the amounts set opposite their respective names, filed with the secretary of this company, to wit:
 Paul Chatham ....................................... 50 shares C. A. Meisenheimer ................................. 10 shares S. B. Alexander, Jr ................................ 25 shares E. T. Garsed ....................................... 25 shares Charles C. Hook .................................... 25 shares W. G. Rogers ....................................... 25 shares Walter M. Paul ..................................... 25 shares J. J. Meisenheimer ................................. 25 shares Robert E. Milligan ................................. 10 shares T. C. Thompson Brothers, approximately ............. 35 shares W. R. Ebert ........................................ 5 shares
The original incorporators, to wit, W. F. Harding, W. O. Gardner, and F. H. Chamberlain, having theretofore each subscribed for ten shares; and whereas the said S. B. Alexander, Jr., E. T. Garsed, Charles C. Hook, W. B. Rogers, T. C. Thompson Brothers subscribed for the number of shares of said stock in said company set opposite their respective names as above, upon the condition that the same should be paid for in services to be rendered the corporation in the construction of a fourteen-story building to be located at the corner of Church and West Trade Streets in the city of Charlotte, and the said Walter M. Paul and J. J. Meisenheimer subscribed for the shares of stock in said company set opposite their respective names as above, on condition that the same should be paid for in services rendered and to be rendered the said corporation, and in consideration of the assignment of an option which the said Paul and Meisenheimer had upon the lot of land (231) above referred to; and whereas the other stockholders above mentioned subscribed for stock set opposite their respective names on condition that the company would proceed forthwith to the erection of said buildings upon said lot, all of which conditions were by the mutual mistake of the parties left out of the paper-writing, signed by them; and whereas, since the organization of said company the *Page 189 
following parties have paid in upon said stock subscriptions, the following amounts, to wit:
 Dr. C. A. Meisenheimer ...................... $1,400.00 J. J. Meisenheimer .......................... 1,400.00 Paul Chatham ................................ 1,400.00 E. T. Garsed ................................ 1,400.00 T. C. Thompson Brothers ..................... 1,400.00 Hook Rogers ................................. 1,400.00 S. B. Alexander ............................. 1,400.00 W. M. Paul .................................. 1,200.00
for which certificates of stock have been issued them respectively; and whereas, it has been decided by the stockholders and officers of said corporation that it is not expedient at this time to proceed with the erection of said building upon the lot aforesaid, in view of the fact that a sufficient amount of stock has not been subscribed to enable the company to proceed therewith, thereby rendering it unnecessary that the parties above named should render the services with which they were to pay for their respective stock subscribed, and that those who made cash subscriptions should pay the same into the treasury of the company: Therefore, be it
Resolved unanimously, That each of the stockholders and stock subscribers to this corporation be and is hereby released from any and all liabilities on his respective stock subscription to said corporation beyond the amount which he has paid in in cash and for which stock certificates have been issued, it being recognized by this company that it is unable to fulfill the conditions upon which said stock subscriptions were made.
It is Further Resolved, That the certificates of stock issued (232) to the said Walter M. Paul and J. J. Meisenheimer for the original amount of their subscriptions be for a like reason surrendered, and that new certificates be issued to each of them for the amount of cash paid in by them respectively as above set forth.
There being no further business, the meeting adjourned.
PAUL CHATHAM, Chairman.
CHARLES C. HOOK, Secretary.
The evidence of defendant was to the effect that plaintiff was present at the meeting and voted for these resolutions, and of plaintiff that he was present and did not vote or make protest against them. In pursuance of the same, certificates of stock were issued to the different subscribers other than plaintiff W. M. Paul, the associate of plaintiff, *Page 190 
as original holder of the option, surrendering his 17 shares, the number issued to him by the company at the time the option was taken over. The plaintiff, who has received a check for $17.01, the difference between the par value of the 14 shares to which he was entitled by the terms of the resolution and the cash paid in by him, to wit, $1,417.01, but has not received and has declined to take the 14 shares or to surrender the 33 shares of original issue.
Thirty thousand of the indebtedness for the purchase money being about to mature, the company having no available means to meet the demand, it was formally proposed to amend the charter, make the issue of stock at present in question, to wit, 400 shares preferred and 400 common stock, as a means of relieving the company and raising the money required to pay the claim. It is assumed and seems to be agreed upon as determinative that, at the corporate meeting when this was decided upon, the measure was properly carried, if plaintiff had the right to vote only 14 shares of stock, and that it would fail if he had the right, as claimed by him, to vote the entire 33 shares. It may be well to note that the resolutions referred to, after reciting that plaintiff and W. M. Paul had made their subscriptions on condition that same should be paid for in services rendered and to be rendered and on assignment of the option, contains provision:
(233) "Therefore, be it Resolved, That each of the stockholders and stock subscribers to this corporation be and is hereby released from any and all liabilities on his respective stock subscription to said corporation, beyond the amount which he has paid in cash and for which stock certificates have been issued, it being recognized by this company that it is unable to fulfill the conditions upon which said stock subscriptions were made.
"It is Further Resolved, That the certificates of stock issued to the said Walter M. Paul and J. J. Meisenheimer for the original amount of their subscriptions be for a like reason surrendered, and that new certificates be issued to each of them for the amount of cash paid in by them respectively as above set forth."
On these, the facts chiefly relevant, we concur in the ruling of his Honor below, that plaintiff's right to vote should be restricted to the 14 shares, and that he is concluded by the force and effect of the corporate resolutions above set out and the acts done pursuant thereto, as to any right to vote the shares in excess of that amount. It is well understood that a stockholder in a private corporation is bound by a corporate resolution regularly passed in accordance with its charter and by-laws (Clark on Corporations, p. 460), and although attended with *Page 191 
some irregularities, a member who is present when a measure is formally passed and votes for the same or fails to make protest, is ordinarily concluded. 1 Cook on Corporations, 6th Ed., secs. 39-730; Callahan v. DitchCo., 37 Col., 331; Wood v. Waterworks, 44 Fed., 146.
It is urged for plaintiff, as we understand his position, that his option was a valuable right which he has passed to the company, and that this transaction should be regarded as an executory agreement to surrender 33 shares in exchange for the 14, and that as to him the resolution providing for such exchange is unenforcible, from a total lack of consideration.
It is not infrequently true that as between the corporation and its stockholders and the stockholders themselves, a by-law or resolution of the company may be considered as a contract. Trust Co. v. Abbott,162 Mass. 148; 10 Cyc., 351. But assuming, as plaintiff contends, that this is a case calling for the application of the principle, the further premise of defendant cannot be maintained, that on the (234) facts in evidence there is a total lack of consideration. In a case of this kind the consent of one stockholder may well be regarded as a consideration for the consent of the others, and the position is emphasized in this instance by the fact that W. M. Paul, the associate of plaintiff, as original holder of the option and who received 17 shares of stock as part of the 50 issued, has surrendered these shares pursuant to the resolution and received or has the right to the number equivalent to the actual cash paid in by him, about $1,200, thus giving the company and plaintiff as one of its members the pecuniary value of the difference. And the surrender of this claim on plaintiff's services recited in the resolutions as part of the consideration for the 50 shares and the relief against the contingent liability of plaintiff to creditors existent when stock has been issued in payment for property, may also be referred to in support of the resolution, the same being one of the requisite steps in affording plaintiff protection from such a demand.
Speaking further to plaintiff's position, that this resolution providing for the surrender of the 33 shares and the issue of the 14 in lieu thereof should be treated as a contract or agreement: while contracts for the sale or transfer of Government securities or shares of stock on the market and readily obtainable, will not as a general rule be specifically enforced, it is otherwise when the agreement, as in this instance, concerns stock of a different character and there are terms giving the contract special significance and presenting a case where the award of ordinary damages in case of breach would be inadequate. The distinction adverted to is very well stated in Cook on Corporations, sec. *Page 192 
338, as follows: "An entirely different rule prevails as regards contracts for the sale of stock of private corporations. If the stock contracted to be sold is easily obtained in the market, and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted to be (235) delivered, a court of equity will decree a specific performance and compel the vendor to deliver the stock."
It is not required, however, in this case that defendants should have recourse directly to this principle in the doctrine of specific performance or the remedy ordinarily available in such cases. The certificate for 33 shares held by plaintiff is not the stock itself, but constitutes onlyprima facie evidence of the ownership of that number of shares. Cook on Corporations, 6 Ed., sec. 13; Clark on Corporations, p. 260. And as between the parties, this resolution of 25 November, approved or certainly acquiesced in by plaintiff, had the force and effect of annulling the 33 shares of stock held by plaintiff or reducing the same to 14, and the company was well within its rights in denying the right of plaintiff to vote the larger number.
It is further insisted for plaintiff that the reduction contended for is not valid because of the failure of the company and the parties to comply with the statutory requirements contained in Revisal, sec. 1164, and particularly as to the publication of the proper notices; but it will appear from a perusal of the section that this provision as to notice is only necessary to afford the stockholders of a corporation protection against creditors. As between the parties, the reduction, if otherwise lawful and valid and pursuant to resolutions properly passed, will bind the members, and may be enforced, as in this instance, by corporate action.
There is no error, and the judgment dissolving the restraining order is
Affirmed.
CLARK, C. J., not sitting. *Page 193 
(236)